IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:22-MJ-192 |
| v. | |
| EDWIN ALONSO VENTURA, | |
| *Defendant*. | |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Vanessa Drew, Special Agent with the Drug Enforcement Administration (DEA), Washington Division Office, Washington, D.C., being duly sworn, depose and state the following:

**INTRODUCTION**

1. I am a Special Agent with the Drug Enforcement Administration and have been since March 2021. I am currently assigned to the DEA High Intensity Drug Trafficking Area Task Force located in Reston, Virginia. During my time in law enforcement, I have participated in the application for search warrants and have participated in the execution of numerous arrest and search warrants in the investigation of narcotics and organized crime-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

2. I graduated from the DEA Academy on July 16, 2021. The extensive training I completed at the DEA Academy consisted of various courses such as: Interview and Interrogation, Drug Identification, Confidential Source Management, Legal Procedures and law regarding Title 21, Report Writing, Evidence Handling, Surveillance, Raids, Combat Shooting, Defensive Tactics, and Physical Fitness. As a narcotics investigator, I have interviewed many individuals involved in

1

drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Based on my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by drug traffickers and abusers of controlled dangerous substances.

3. Based upon this experience, I have become knowledgeable about the methods and modes of narcotics operations, as well as the language and patterns of drug use and trafficking. During the course of my participation in investigations of narcotics trafficking organizations, I have testified in grand jury proceedings. I have gained knowledge in the use of various investigative techniques including the use of physical surveillance, undercover agents, confidential informants, the controlled purchase of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

4. I submit this affidavit in support of a criminal complaint charging EDWIN ALONSO VENTURA with conspiracy to distribute 40 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

5. The facts and information contained in this affidavit are based on my personal knowledge of this investigation, my training and experience, information from interviews, information obtained from other state and federal law enforcement officers, and my review of documents and materials associated with the case.

6. This affidavit contains only the information necessary to support probable cause and therefore does not include all information known by me or the United States.

## PROBABLE CAUSE

7. In June 2021, with the assistance of a cooperating source[1] (CS), DEA identified the defendant, EDWIN ALONSO VENTURA, as a narcotics distributor. CS stated that VENTURA previously purchased large quantities of cocaine from CS, who estimated that VENTURA purchased between 250 and 500 grams of cocaine from CS approximately every two weeks for approximately six months.

8. On June 3, 2021, at the direction of law enforcement, CS met with VENTURA at his place of employment, a car dealership located in Woodbridge, Virginia. During this meeting, VENTURA and CS discussed potential future narcotics transactions and exchanged phone numbers. VENTURA and CS maintained contact after that meeting. Based on their numerous conversations, VENTURA told CS that he had a new source of supply for cocaine from Philadelphia, Pennsylvania. VENTURA stated that he was obtaining up to a kilogram of cocaine at a time for $37,000 per kilo.

9. VENTURA also told CS that he had access to large amounts of "Percocet" pills, which he was selling for $4.75 per pill. Based on CS' knowledge of the cost of similar pills, CS believed the cheap price indicated that the "Percocet" pills were likely counterfeit and likely contained fentanyl.

---

[1] CS has been cooperating with DEA since responding to a target letter issued by the U.S. Attorney's Office for the Eastern District of Virginia. CS agreed to cooperate with law enforcement in consideration for reduction of future narcotics distribution charges. CS will be referred to in the masculine regardless of his or her actual gender. CS has provided information to law enforcement that has been corroborated by information obtained from various public databases, law enforcement databases, and telephone records. His information has never been found to be false or misleading. For these reasons, I consider CS to be reliable.

### A. Law enforcement obtains fentanyl pills from Individual-1 on several occasions.

10. On or about October 18, 2021, at the direction and supervision of law enforcement, CS met with VENTURA at the car dealership in Woodbridge in order to obtain a sample of "Percocet." During their meeting, VENTURA said that he did not have any "Percocet" at that time. VENTURA proceeded to call his source for the pills, but the source did not answer. VENTURA told CS that his source worked at the same car dealership but was not working that day. VENTURA agreed to give CS a sample of "Percocet" once he obtained more pills.

11. On or about November 18, 2021, at the direction of law enforcement, CS contacted VENTURA to request the sample of "Percocet." VENTURA gave CS his source's phone number and told CS to contact the source directly. Subsequently, at the direction of law enforcement, CS called VENTURA's source—known to CS by his first name only—to request a sample of "Percocet." Law enforcement subsequently identified that person as Individual-1. Law enforcement showed CS a photo of Individual-1, who CS identified.

12. On or about November 22, 2021, CS obtained a one-pill sample from Individual-1. Law enforcement agents met with CS at a pre-determined location prior to the meeting. Agents searched CS for contraband and currency with negative results. Agents provided CS with a transmitting device and a recording device before following CS to the car dealership. After CS arrived, law enforcement observed Individual-1 exit the service bay area and meet with CS in CS' vehicle. After a few minutes, law enforcement observed Individual-1 get out of the vehicle and return to the dealership building as CS departed the area. CS provided agents with the one-pill sample of "Percocet" received from Individual-1. Agents also retrieved the transmitting device and recording device and searched CS for currency and contraband, with negative results.

13. The pill was submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. Analysis showed that the pill contained fentanyl and weighed .103 grams, or 103 milligrams.

14. Following the initial acquisition of the one-pill sample from Individual-1, DEA conducted several controlled purchases of pills from Individual-1.

**B. *Controlled purchase of 50 pills on March 10, 2022.***

15. On or about February 25, 2022, CS advised agents that VENTURA contacted CS via a Facebook Video call on February 19, 2022. CS stated that VENTURA offered to sell CS the same kind of pills that CS had been purchasing from Individual-1. CS stated that VENTURA showed CS approximately 400 to 600 pills while on the Facebook video call.

16. On or about March 8, 2022, at the direction of law enforcement, CS contacted VENTURA to ask to buy 50 pills from VENTURA later that week. VENTURA told CS that the pills would cost $15 each and agreed to conduct the transaction on March 10, 2022.

17. On or about March 10, 2022, law enforcement met with CS at a pre-determined location prior to the controlled purchase. Agents searched CS for contraband and currency with negative results and provided CS with $750 official advanced funds (OAF) and an audio recording/transmitting device.

18. Agents subsequently followed CS to the car dealership in Woodbridge. While en route to the dealership, agents monitoring the transmitting/recording device heard CS talking to VENTURA on speaker phone. VENTURA told CS that they had to "go up the street" to get the pills. Law enforcement then observed CS turn into the dealership parking lot. A short time later, agents observed VENTURA get into the front passenger seat of CS' vehicle. CS exited the dealership parking lot and mobile surveillance of CS' vehicle ensued.

19. Agents followed CS' vehicle to the Signal Hill Apartment complex located at 2170 Sentry Falls Way, Woodbridge, Virginia. CS' vehicle parked in front of the apartment building located at 15125 Beacon Ridge Drive. VENTURA exited CS' vehicle and walked into the main entrance of 15125 Beacon Ridge Drive. After a few minutes, law enforcement observed VENTURA exit the building and return to the passenger seat of CS' vehicle.

20. A short time later, CS' vehicle departed the area, followed by law enforcement. Law enforcement observed CS drop-off VENTURA at the car dealership and then followed CS to the pre-determined location where CS provided agents with 50 pills purchased from VENTURA. Agents also retrieved the transmitting/recording device and searched CS for currency and contraband, with negative results.

21. The 50 pills were submitted to the DEA Mid-Atlantic Laboratory for testing, storage, and safekeeping. Analysis showed that the 50 pills supplied by VENTURA contained fentanyl and weighed approximately 5.450 grams.

22. CS also advised that VENTURA stated his source of supply had tattoos on his face. Law enforcement confirmed that JOHN ESTIVEN GUZMAN has tattoos on his face. A subsequent search of law enforcement indices revealed that GUZMAN is associated with 15125 Beacon Ridge Drive, Apartment 318, Woodbridge, Virginia. Subpoenaed records from the apartment-management company revealed the listed tenant for Apartment 318 as a female associated with GUZMAN.

C. *Controlled purchase of 100 pills on April 8, 2022.*

23. On April 6, 2022, at the direction of law enforcement, CS contacted VENTURA via phone call and requested to purchase 100 pills. VENTURA told CS the pills would cost $15 each and agreed to meet CS to conduct the transaction on April 8, 2022. VENTURA also advised

CS that the transaction would likely occur at VENTURA's place of employment (the car dealership in Woodbridge).

24. On April 8, 2022, law enforcement met with CS at a pre-determined location prior to the controlled purchase. Agents searched CS for contraband and currency with negative results. Law enforcement provided CS with $1,500 OAF and an audio recording/transmitting device and a second recording device.

25. Agents followed CS' vehicle to the car dealership. Agents conducting surveillance of the dealership observed VENTURA exit a white Toyota SUV and walk toward CS' vehicle. Law enforcement observed VENTURA go to the passenger side window of CS' vehicle a few times, until agents observed a white BMW sedan arrive and park at the dealership parking lot. Based on the license plate, agents determined that the vehicle is registered to JOHN ESTIVEN GUZMAN. Agents observed VENTURA walk to the BMW, speak with the driver of the BMW, and then walk back to the passenger side window of CS' vehicle. VENTURA then walked from CS' vehicle back to the white BMW and briefly got into the passenger seat of the BMW. Agents conducting surveillance on the BMW observed the vehicle travel from the dealership parking lot to 15125 Beacon Ridge Drive and confirmed GUZMAN to be the driver.

26. CS provided to law enforcement 100 blue pills in a white plastic bag obtained from VENTURA. The pills were submitted to the DEA Mid-Atlantic Laboratory for testing. Analysis revealed that the 100 pills contained fentanyl and weighed 11.04 grams.

**D. *Controlled purchase of 155 pills on June 8, 2022.***

27. On June 3, 2022, at the direction of law enforcement, CS contacted VENTURA via phone call and requested to purchase 150 pills. VENTURA advised that he would get back to CS. On June 5, 2022, VENTURA contacted CS via a FaceTime video call. CS stated that VENTURA

advised that "his boy," (meaning GUZMAN) had changed his number after GUZMAN's source got "locked up." VENTURA also told CS that GUZMAN was lying low after his source of supply was arrested. CS stated that VENTURA was working on getting the 150 pills the CS ordered from a different source of supply.

28. On June 6, 2022, at the direction of law enforcement, CS met with VENTURA at the car dealership in order to continue negotiations regarding the purchase of pills. Subsequent to their meeting, VENTURA called another source and asked about getting 150 pills. This source said he would charge $13 per pill. VENTURA and CS agreed to talk the following day (June 7) and do the deal the day after that (June 8).

29. On June 7, 2022, CS advised law enforcement that VENTURA had called CS via Facetime. CS advised that VENTURA was with "his man" with the face tattoos (GUZMAN). During the call, VENTURA stated the pills from the other source were not any good; GUZMAN gave CS his phone number, and he agreed to sell 150 pills to CS the following day. GUZMAN told CS to call him directly and to let him (GUZMAN) know two hours before CS wanted to meet to conduct the transaction.

30. On June 8, 2022, prior to the controlled purchase, at the direction of law enforcement, CS contacted GUZMAN. During their conversation, GUZMAN agreed to sell CS 160 pills later that evening. Before meeting with law enforcement, CS advised that GUZMAN texted the following address: "15125 beacon ridge drive, Woodbridge, VA, 22191" (GUZMAN's residence) to meet to conduct the transaction. On the same day, law enforcement met with CS at a pre-determined location prior to the controlled purchase. Agents searched CS for contraband and currency with negative results. Law enforcement provided CS with $2,250 OAF and a transmitting/recording device.

31. Agents followed CS' vehicle to GUZMAN's residence. Agents monitoring the transmitting/recording device heard CS call GUZMAN and tell GUZMAN that CS was there and provided GUZMAN with a description of CS' vehicle. Agents monitoring the electronic surveillance of GUZMAN's apartment observed GUZMAN exit the apartment wearing a black hoodie. Agents then observed GUZMAN exit the building and walk toward CS' vehicle. A short time later, agents monitoring the transmitting/recording device observed GUZMAN enter the front passenger side of CS' vehicle. GUZMAN and CS engaged in conversation regarding the price of the pills and determined CS was "short" some money. CS gave GUZMAN the $2,250 OAF, which GUZMAN counted. A few minutes later, agents observed GUZMAN exit the CS vehicle and jog toward the center entrance as the CS vehicle departed the area.

32. A short time later, agents monitoring the camera set-up outside of GUZMAN's apartment observed GUZMAN return to apartment 318. Agents followed CS back to a pre-determined location. CS provided law enforcement 155 pills in a Ziploc bag obtained from GUZMAN. CS said that the price per pill was $14, but GUZMAN said that the price was actually $15 per pill. The CS advised GUZMAN told CS not to worry about the additional $75 owed. CS and GUZMAN discussed a possible purchase for more pills for the following week. The pills were submitted to the DEA Mid-Atlantic Laboratory for testing. Analysis revealed that the 155 pills contained fentanyl and weighed approximately 16.9 grams.

**E. Controlled purchase of 350 pills on June 16, 2022.**

33. On June 15, 2022, at the direction of law enforcement, CS contacted VENTURA to arrange a purchase of 350 pills. VENTURA informed CS that VENTURA would contact his source of supply. Shortly after that, GUZMAN texted CS to confirm the deal for June 16, 2022. CS and GUZMAN agreed the price of the pills would be approximately $13 per pill.

34. On June 16, 2022, CS and GUZMAN continued to communicate via text message. They agreed to again conduct the transaction near GUZMAN's residence. Around the agreed upon time, CS informed GUZMAN that CS arrived at GUZMAN's apartment. In fact, CS was not at the apartment, and when GUZMAN left the apartment, law enforcement stopped him, searched him, found 350 pills suspected to contain fentanyl, and arrested him. Around the same time-period as law enforcement arrested GUZMAN, VENTURA was in contact with CS asking about his cut of the deal. The pills were submitted to the DEA Mid-Atlantic Laboratory for testing. Results are pending.

## CONCLUSION

35. Based on the foregoing, I respectfully submit that there is probable cause that, from at least in or about March 2022 and continuing to June 2022, in the Eastern District of Virginia and elsewhere, EDWIN ALONSO VENTURA, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to unlawfully, knowingly, and intentionally distribute 40 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Respectfully submitted,

Special Agent Vanessa Drew
Drug Enforcement Administration

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on July 25, 2022.

Digitally signed by Ivan Davis
Date: 2022.07.25 12:28:32
-04'00'

The Honorable Ivan D. Davis
United States Magistrate Judge